Miles JACKSON, Rusty Hamby, and Confederate Memorial Camp 1432, Sons of Confederate Veterans, Plaintiffs,

v.

CITY OF STONE MOUNTAIN, et al., Defendants.

No. 1:00–CV–1075–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

March 28, 2002.

Sam Glasgow Dickson, Office of Sam G. Dickson, Atlanta, GA, for Plaintiffs.

Caryl Summer Black, Office of Caryl Summer Black, Joe L. Fowler, Fowler Hein Cheatwood Passino & Williams, Atlanta, GA, for Defendants.

## ORDER

CARNES, District Judge.

This case is before the Court on defendant City of Stone Mountain's Motion for Summary Judgment [44]. The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that defendant's Motion for Summary Judgment [44] should be **GRANTED in part, and DENIED in part.**

## BACKGROUND

Plaintiffs filed the original Complaint [1] in this action on April 26, 2000. Plaintiffs alleged that the City of Stone Mountain (the "City"), along with the Mayor and all of the individual members of the City Council, acting under color of state law, deprived the plaintiffs of their constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments, and the plaintiffs sought damages and injunctive relief under 42 U.S.C. § 1983 ("Section 1983"). Plaintiffs Miles Jackson, Rusty Hamby, and the Confederate Memorial Camp 1432, Sons of Confederate Veterans, alleged that they erected a flagpole in a cemetery owned by the City for the purpose of flying a flag in honor of the approximately 150 Confederate soldiers who are buried in the cemetery, and that agents or employees of the City, acting at the explicit direction of the Mayor and/or the members of the City Council, destroyed the flagpole in violation of the plaintiffs' constitutional rights.

On the same day that the plaintiffs filed their original Complaint, they also filed a Motion for Preliminary Restraining Order [3], requesting that the Court prohibit the defendants from interfering with the proposed ceremony in honor of Confederate Memorial Day that was scheduled for that evening of April 26, 2000. That same day,

the Court granted the plaintiffs' motion [5].

Pursuant to a Scheduling Order dated July 11, 2000[13], the discovery period in this action expired on December 23, 2000, and motions for summary judgment were due on or before January 19, 2001. Upon a joint motion by the parties [15], the Court extended the deadline for motions for summary judgment through February 16, 2001[19], and all parties filed timely motions for summary judgment [17][28]. On the same day plaintiffs filed their motion for summary judgment, February 16, 2001, they also filed a Motion for Leave to file an Amended Complaint [26], and attached the proposed Amended Complaint to such motion. In the proposed Amended Complaint, the plaintiffs added a cause of action that had not been asserted in the initial Complaint, but they named only the City as a defendant, and did not name the Mayor or any of the individual City Council members as defendants.

In an Order dated April 9, 2001[41], the Court granted the plaintiffs' motion for leave to file the Amended Complaint [26], and also denied the parties' cross-motions for summary judgment without prejudice to re-filing. In addition, the Court requested that the plaintiffs clarify their position regarding the dismissal of their claims against the individual plaintiffs named in the initial Complaint. On May 7, 2001, the plaintiffs responded that they "agree that Mayor Burris should be dismissed" and that they "withdraw any opposition to dismissal of the individual defendants named in the original Complaint." (Pls.' Resp. [42] at 1.) Subsequently, defendant the City of Stone Mountain filed a second Motion for Summary Judgment [44], which is now pending before the Court.

## FACTS

Unless otherwise indicated, the Court draws the undisputed facts from "Defendant's Second Statement of Material Facts" ("SMF") [44]. Plaintiffs have failed to file their own Statement of Material Facts in response to defendant's motion, as required by Local Rule 56.1, NDGa. Pursuant to Local Rule 56.1:

> The respondent to a motion for summary judgment shall attach to the response a *separate* and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. *Response should be made to each of the movant's numbered material facts.* All material facts contained in the moving party's statement which are not *specifically controverted* by the respondent in respondent's statement shall be deemed to have been admitted.

LR 56.1B(2), NDGa (emphasis added). Because plaintiffs have failed to comply with this rule by filing a separate statement of material facts in which they respond to each of the movant's numbered facts, plaintiffs have failed to controvert any of defendant's material facts; thus, pursuant Local Rule 56.1, all of defendant's numbered facts in its Statement of Facts are deemed admitted.

Nevertheless, the Court must view all evidence and factual inferences in the light most favorable to plaintiffs, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett,* 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir.1993). Accordingly, the Court has referred to the Statement of Material Facts filed by plaintiffs in connection with their original motion for summary judgment [28] in an ef-

fort to determine which facts are indeed undisputed, and has assumed the following facts in the light most favorable to the plaintiffs for the purpose of resolving the defendant's motion for summary judgment. Additional relevant facts are included in the discussion below.

The Stone Mountain Cemetery (the "Cemetery") is located within the incorporated boundaries of the City of Stone Mountain, Georgia. (SMF at ¶ 1.) The Cemetery contains the graves of deceased persons dating back to the Civil War, including the graves of approximately 150 Confederate soldiers. (SMF at ¶¶ 2–3.) According to the Complaint, during the Civil War, there was a Confederate hospital located in Stone Mountain that treated many of the Confederate soldiers wounded during the Battle of Atlanta, and the approximately 150 soldiers buried at the Stone Mountain Cemetery were among those who had died at that hospital, "their identities known but to God." (Am. Cpt. [26] at ¶ 4.4.)

The Sons of Confederate Veterans ("SCV"), of which plaintiff Confederate Memorial Camp 1432 (the "Camp") is a part, is described by the plaintiffs as an "organization dedicated to preserving the historical truth about the War Between the States, to honoring the members of the armed services of the Confederate States of America, and to keeping alive the memory of the sufferings of the people of the Southern States at the hands of the invading Federal armies such that such sufferings shall not occur again." (Am. Cpt. [26] at ¶ 4.6.) In recognition and honor of the Confederate war dead in the Cemetery, annual ceremonies have been permitted by the City and conducted by the SCV on Confederate Memorial Day (April 26) for a number of years. (SMF at ¶ 4; Am. Cpt. at ¶ 4.11.) Every year before these ceremonies, members of the SCV place small Confederate flags on each of the Confeder-

ate graves, where the flags are left until members of the community, descendants, or other relatives remove them. (Jackson Dep. at 16–17.)

Since April 14, 1989, the City has had a Cemetery Ordinance, which described the rules and regulations related to the use of the Cemetery. (SMF at ¶ 5; Burris Dep., Ex. 18.) Two stone monuments reflecting the Cemetery regulations are placed at the entrance to the Cemetery and at the entrance to the section of the Cemetery containing the graves of the Confederate war dead, respectively. (SMF at ¶ 6.) The Ordinance, as it was in effect from April, 1989 through September, 1999, did not mention anything about flagpoles. (See Burris Dep., Ex. 18.) In addition, the Ordinance gave the "sexton," the person designated and appointed by the Mayor to oversee the Cemetery, a great deal of discretion in managing the operations of the Cemetery:

> The Sexton and his/her agents have authority to enter upon any lot and to remove any objectionable thing or any erection that may have been placed there contrary to any regulations, and may remove any dead or dangerous tree, shrub or vine.
>
> \* \* \* \* \* \*
>
> In restricting the manner of improvement and embellishment of lots, the Sexton has no wish to interfere with the taste of the lot owners in regard to the style of their improvements, but in justice to the interest of all, the Sexton reserves the right of preventing the erecting of or removing any structure of enclosure which they shall consider injurious to the immediate locality or prejudicial to the general good appearance of the cemetery .... This end, it will be readily conceded, cannot be attained if each individual is permitted to determine how and what shall be done upon

his lot, for no matter how appropriately and tastefully this may be done, the work may be undone by the lack of taste and judgment exhibited by the adjoining lot owner in some glaring combination of colors, unstable monuments, or dilapidated fence.

(*Id.* at 3–4.)

For at least the last ten years, no flagpole has been erected in the Cemetery. (SMF at ¶ 7.) In 1994, the SCV sought authorization from the Mayor and the City Council of Stone Mountain to erect a flagpole to fly the Confederate flag near the Confederate graves in the Cemetery. (SMF at ¶ 8.) The request was denied. (SMF at ¶ 9.) At the time the Council denied the SCV's request for a flagpole in 1994, Charles Burris was a member of the City Council; in 1997, he was elected Mayor of Stone Mountain. (Burris Dep. at 8–9.) In a magazine article published in January, 1999, Mayor Burris was quoted as follows:

> I really ticked off the Sons of Confederate Veterans before the Olympics. Folks were going to be flocking here, so the Sons wanted to fly a Confederate flag over the cemetery. I voted it down. There are black folks in this town who have relatives in that cemetery, too, and I'd be damned if I was going to allow that flag to fly over their graves.

(Burris Dep., Ex. 6, at 8.) Mr. Burris stated that the quote was an accurate reflection of the statement he made to the reporter who wrote that article, and that it was an indication of his feelings at the time he was interviewed, which was some time in 1997 or 1998. (Burris Dep. at 14–15.)

At all times relevant to this action, plaintiff Miles Jackson was the Commander of Confederate Memorial Camp 1432 of the SCV, and plaintiff Rusty Hamby was the Lieutenant Commander of the Camp. (Am. Cpt. at ¶¶ 2.1, 2.2.) On September 26, 1996, and March 28, 2000, the SCV, by and through its officers Jackson and Hamby, purchased a total of four burial plots at the Cemetery that were immediately adjacent to and behind the graves of the Confederate soldiers. (SMF at ¶ 7; Pls. Statement of Facts ["Pls. SMF"] [28] at ¶ 6.) The SCV purchased those plots for the purpose of erecting a flagpole so that a flag could be flown in honor of the Confederate war dead. (Pls. SMF at ¶ 6.)

Although there was no formal process for requesting authorization from the sexton to build a monument or other structure, the revised 1999 Cemetery Ordinance required such authorization for any "work" done in the cemetery. (*See* SMF at ¶ 12, 13; *see also* Burris Dep., Ex. 17, at Sec. 6–8.) The Cemetery Ordinance had been revised in September, 1999, after a complaint had been raised about damage that had been done to an existing grave site during the excavation of another burial plot. (SMF at ¶ 15; Burris Dep. at 63–64, Ex. 17.) The revised Ordinance defined the "sexton" as the City Manager or the City Manager's designee. (Burris Dep., Ex. 17, at Sec. 6–2.) At all times relevant to this action, the City had no City Manager. (SMF at ¶ 19; Burris Dep. at 40.) The revised Ordinance contained a section titled "Rules for construction and maintenance," which provided, in relevant part:

> 1. All work must be approved in advance by the sexton including that done by private owners, contractors, and monument companies.
>
> 2. Monuments, paving, curb, wall, coping or any other edifice constructed on cemetery lots shall be made of marble, granite or other natural stone material. No brick or cinder block material shall be allowed in the construction or repair of any cemetery lot or monument. Steel reinforced concrete walls shall be allowed upon approval by the sexton. . . .

9. The sexton shall have the authority to enter any lot or grave site and issue stop work orders in connection with any provision of Section 6.8. The sexton shall also have the authority to remove any dead or dangerous tree, shrub, vine, structure, or any object contrary to the regulations contained in Section 6.8.

(Burris Dep., Ex. 17, at Sec. 6–8.)

The Ordinance did not contain any explicit procedures for obtaining authorization from the sexton, and any "approval process," if such process existed, was extremely informal. (*See* Tuggle Dep. at 8, 10–11, 13.) According to Hilliard "Tug" Tuggle, a volunteer who served as the sexton of the Cemetery at all times relevant to this action, there has never been any written form by which approval is granted or denied, and the requests and permissions have always been oral. (*Id.* at 14.) Other than the Ordinance itself, Tuggle is not aware of any written rules or regulations related to the sexton's decision whether to grant or deny permission to anyone wishing to build a monument or other structure in the Cemetery. (*Id.* at 13–14.) On the few occasions when someone did consult him about a monument or other structure, Tuggle stated that his only concern was that they not use brick or concrete or other material that deteriorates and crumbles over time. (*Id.*) He could only recall one instance of requiring anyone to tear down a structure, which occurred when someone had built a retaining wall out of concrete block and he forced them to tear it down and rebuild it. (*Id.* at 10–11.) Few people ever actually consulted him for permission, however. In fact, Tuggle stated that "less than ten percent of the people who put a monument, consult me. And I am not going to police the cemetery." (*Id.* at 11.) [1]

Some time in 1996, around the time the first two plots were purchased by the SCV, Hamby met with Tuggle to discuss the plots. (*See* SMF at ¶ 11.) Hamby and Tuggle had known each other for several years, and according to Tuggle, were friends, or at least friendly acquaintances. (*See* Tuggle Dep. at 17; Hamby Dep. at 15–17.) Hamby claims that he and Tuggle discussed the topic of the SCV's desire to erect a flagpole on the plots "at least five times," and Tuggle "said that it was fine." (Hamby Dep. at 15–16.) Tuggle, on the other hand, does not dispute that he and Hamby had conversations about the plots, but states that he did not know that the SCV intended to erect a flagpole on them, and further states that he did not give any permission or authorization for them to do so. (Tuggle Dep. at 16–17, 19.)

Both Hamby and Tuggle agree that they had at least one conversation in March, 2000, about the SCV's intention to build something on the plots. Tuggle had been walking his dog in the Cemetery when he noticed that there were surveying tapes on the plots owned by the SCV, and there was "an X pattern." (Tuggle Dep. at 20.) Tuggle thought that the SCV intended to build a granite slab on the plots, and "thought the X was for the battle flag." (Tuggle Dep. at 20.) Tuggle called Hamby and described their telephone conversation as follows:

Rusty said, and I don't recall our full conversation. I just—but in my mind, what I—what I thought they were probably going to do was put a granite slab. And I thought the X was for the battle flag. And frankly, I thought that will look great. But anyway, when I called Rusty, I said, what are you all getting

---

**1.** Indeed, Tuggle's permanent residence is not in Stone Mountain, but Jasper, Georgia. (Tuggle Dep. at 4–5.) Thus, Tuggle was able to monitor the cemetery only on those occasions when he was staying at his second home in Stone Mountain.

ready to do? He said, you don't want to know. And I let it drop at that.

(Tuggle Dep. at 20.)

Hamby remembers the conversation differently. According to Hamby, he specifically told Tuggle that the SCV intended to put up a flagpole. (Hamby Dep. at 24–25.) Hamby described the conversation as follows:

> Well, Tug was aware of the flagpole. I regret to say I have nothing in writing. I will say that I did receive a phone call prior to the erection of the flagpole, and Tug called and he had been walking his dog in the cemetery. And he said that he had seen some surveyor marks, and what was the camp planning to do? And I told him we're going to put up a flagpole. And he said, "Well, Rusty, let's talk about this." And I said, "I'm not on that [flagpole] committee. I am a member of the camp. But I can put you in touch with the people that you need to talk to."
>
> And at that time in typical Tug fashion he said, "Oh, hell, I don't need to know about this." And I'm sure there were other things, but that's what I remember.

(Hamby Dep. at 24–25.)

On or about April 15, 2000, SCV arranged to have a flagpole erected on one of the plots it had purchased in the Cemetery, with the intention of displaying a Confederate flag during the annual Confederate Memorial Day service that was scheduled to be held in the Cemetery on April 26, 2000.[2] (See Pls. SMF [28] at ¶ 19; Am. Cpt. [26] at ¶ 4.11.) The SCV had arranged for the Ruffin Flag Compa-

ny to erect the flagpole, and neither plaintiff Jackson nor plaintiff Hamby were present at the time the flagpole was erected. (See Jackson Dep. at 20; Hamby Dep. at 25.) When the flagpole was erected, there was no flag flying on the flagpole. (See Tuggle Dep. at 23–24.) Tuggle described it as a bare flagpole with a gold cross finial at the top. (Id.)

Mayor Burris first learned about the flagpole on or about April 17, 2000, when City Council member Gary Peet informed him and the other members of the City Council that the SCV had erected a flagpole in the Cemetery. (SMF at ¶ 21; Burris Dep. at 15, 18.) Because the SCV's earlier request to erect a flagpole in 1994 had been denied, some of the members of the City Council believed the SCV had "intentionally sneaked" in and erected the flagpole, and most of the Council members believed that the flagpole was erected in violation of the Ordinance. (SMF at ¶¶ 23, 24; Burris Dep. at 19–20.) The Mayor and City Council decided to call a special meeting of the City Council on April 18, 2000, to address the matter of the flagpole. (SMF at ¶ 25.)

Mayor Burris volunteered to personally contact Hamby to notify him of the special meeting set for April 18, 2000. (SMF at ¶ 26; Burris Dep. at 22.) Late in the evening on April 17, 2000, at approximately 10:30 or 11:00 p.m., Burris called Hamby at his home to discuss the matter of the flagpole and the special meeting.[3] (SMF at 27; Burris Dep. at 23; Hamby Dep. at 18.) Hamby was asleep and his mother woke him up to take the call. (Hamby Dep. at 18.) According to Hamby, Burris

---

**2.** Although the plaintiffs allege in their Amended Complaint that the flagpole was erected on or about April 15, 2000, neither party has provided evidence of the actual date the flagpole was erected. That date is consistent with the evidence in the record, however, and it is undisputed that the Mayor and City

Council learned of the flagpole on or about April 17, 2000. (See Burris Dep. at 18.)

**3.** Burris states that it was approximately 10:30 p.m. when he called Hamby; Hamby states that it was "close to 11 o'clock." (Burris Dep. at 23; Hamby Dep. at 18.)

asked him if he was aware of the flagpole in the Cemetery, and mentioned that a specially called City Council meeting was set for the following evening. (*Id.*) Burris said that he was worried about bad publicity for the village, and mentioned that Council Member Nash had suggested that a "First National Flag" be flown in lieu of the Confederate battle flag. (*Id.*) Hamby explained to Burris that he was not a member of the flagpole committee and that he would put him in touch with the chairman of that committee, who he believed was Chris Davis.[4] (*Id.* at 18–19.) As Hamby described the conversation:

> I remember him [Burris] using terms like he wanted to avoid a media circus. He was very polite. He was very concerned. And I simply told him that I was not the person to talk to. I would get him the names and numbers of the people he could deal with in relation to this issue.

(*Id.* at 19.) Hamby further states that the very next day he called City Hall and gave Jane Whittington the name and telephone number of Chris Davis, and possibly some other names and numbers of SCV members to contact about the flagpole situation. (*Id.*) He never spoke with Burris again about the subject of the flagpole. (*Id.* at 20.)

Burris recalls the telephone conversation on the night of April 17, 2000, differently. Burris claims that he told Hamby about the special meeting scheduled for the following day, Hamby advised him that "he was no longer a member," and Burris asked Hamby to please have someone contact City Hall the next day. (Burris Dep. at 24.) Burris further described the conversation as follows:

> I told Rusty that there was concern that the flagpole was illegal, that the council was not desirous of a confrontation, that

I didn't want a confrontation. I said that we wanted to sit down with the Sons of the Confederate Veterans in an effort to find some compromise and that Council Member Nash had suggested or recommended a compromise position involving the official flag of the Confederacy.

> He said that the SCV did not want any compromise. They wanted conflict. He was no longer a member.

(*Id.*)

The next evening, April 18, 2000, the special call meeting was held at City Hall, but nobody from the SCV was present, and there was not even a quorum of City Council members present, which, according to Burris, would require at least three Council members in addition to himself. (*Id.* at 25.) Burris told the Council members present about his conversation with Hamby the night before, and indicated that he had not heard anything further from anyone at the SCV and did not know if anyone from the SCV would be attending the meeting. (*Id.* at 26.) According to Burris, the lack of a quorum meant that he could not even call a meeting, and thus, the "attempted meeting" lasted only from 7:45 p.m. until approximately 8:00 p.m. (*Id.* at 27.)

Mayor Burris thereafter printed out and reviewed a copy of the Cemetery Ordinance, and sought the advice of the City Attorney, Joe Fowler, about how to resolve the flagpole situation. (SMF at ¶ 30; Burris Dep. at 28.) On April 20, 2000, Fowler called Sam Dickson, counsel for plaintiffs in the instant action, to ask Dickson if he was authorized to act as counsel for the SCV; although Dickson had not yet been retained at the time he received the phone call from Fowler, later that day,

---

**4.** Miles Jackson stated that it was actually Brent Griffin who was in charge of the Camp's flagpole committee. (Jackson Dep. at 20.)

Dickson was retained to represent the Camp with respect to any action taken against them about the flagpole. (*See* Burris Dep., Ex. 12.) Dickson then wrote a letter to Fowler dated April 20, 2000, that stated in relevant part:

> In the event the City contemplates any legal action in regard to the matter, I would appreciate courtesy notice of any action or hearing....
>
> This letter is written with an eye toward avoiding confrontation and hostility and I do not want it to be interpreted any other way.
>
> My clients do not desire and are not seeking confrontation. They are not anticipating that there will be a problem now or in the future.
>
> However, they are aware of tensions and concerns in the City government over the raising of a Confederate flag in the City Cemetery....
>
> For their part they are not seeking trouble. One of them has spoken with the Mayor recently. My impression is that there was a suggestion made to the SCV member that the Camp might consider a compromise of some sort with the City to avoid what was characterized as a possible media frenzy.
>
> While we are not seeking trouble, neither are we willing to agree to any compromise limiting or abridging our rights as American citizens to assemble in a peaceful manner to commemorate our war dead and the cause for which they died. We also cannot agree to any compromise restricting our right to display our historic regional symbols.
>
> We understand and regret that this may cause offense to some citizens and civic leaders in the City of Stone Mountain. However, tolerating the views and activities of others which do not accord with or may even offend our own is a price—a small price—to pay to live in a free society.

> In the unfortunate event of some action by the City intended to limit the rights of the SCV Camp and its members, such action will be strongly resisted. If the circumstances are appropriate, the Camp will seek an award of all damages available under applicable law including such damages as are provided under U.S.C. 42–1983.

(Burris Dep., Ex. 12.) Plaintiffs contend that they never received any further communication from the City after their counsel sent that letter to Fowler on April 20, 2000. (*See* Pls. SMF at ¶ 27; Jackson Dep. at 18–19.)

Tuggle first learned of the flagpole when Councilman Peet called him to tell him. Tuggle described the conversation as follows:

> And I got a call, and I think it was from Councilman Peet. And he said, have you seen the flagpole? I said, what flagpole? And he said that a flagpole had been erected. And so I said, well, let me go over there and look at it. So I took the dog and went over and saw it. Very nice flagpole. And I called him back, and I said, well, it is a very nice flagpole. And that was the extent of that....
>
> I think that he asked me point blank, if I gave permission. And I said, you know, this is my first knowledge of it, I don't— no, I have never—it is a non-issue with me.

(Tuggle Dep. at 22–23.) According to Tuggle, the next communication that he had with anyone concerning the flagpole occurred when someone from the Mayor's office called him a few days later. (*Id.* at 25.) The Mayor came on the line and requested that Tuggle come to his office to sign a statement reflecting that he had no knowledge of the flagpole. (*Id.*) Tuggle subsequently signed a statement in the form of a letter to Mayor Burris and the

City Council, dated April 24, 2000, reflecting that he had never received a request from the SCV for permission to erect a flagpole, and thus, he never granted his approval or disapproval. (*See* Burris Dep., Ex. 10.) According to Tuggle, signing that statement was the extent of his involvement in the matter; he was never invited to any meeting about the flagpole and he was never consulted on any decision regarding what to do about the flagpole. (Tuggle Dep. at 26–27.)

Mayor Burris contends that it was actually Tuggle who called his office, not the other way around. (Burris Dep. at 39.) According to Burris, Tuggle called his office and was "extremely upset." (*Id.* at 38.) Tuggle said that "he had never discussed this with SCV and never approved it." (*Id.*) The Mayor asked him if he would put that in writing, and he agreed. (*Id.* at 38–39.) When asked if he had consulted Tuggle on the decision to remove the flagpole, Burris responded: "I don't think I discussed it with him." (*Id.* at 39.)

On the morning of April 24, 2000, the Mayor held a regular weekly staff meeting, which included various City department heads, including James Tavenner, Director of Public Works, as well as the City Clerk and finance officer. (Burris Dep. at 37.) At the beginning of the meeting, Mayor Burris directed the City Clerk to call the City Attorney's office to see if Fowler had finished a report on the flagpole situation; soon thereafter, Fowler's office faxed a copy of a memorandum Fowler had written, addressed to the Mayor and all Council members, reflecting his conclusion that the flagpole violated the City Ordinance because it had not been authorized by the sexton, and because it

was not made of marble, granite, or other natural stone material. (*Id.* at 31, 37, Ex. 11.) [5] The Mayor received this faxed memorandum during the staff meeting, and read it in the middle of the meeting. (Burris Dep. at 38.)

Based upon his belief that the flagpole had been erected without proper authorization or notice, and based upon the input and advice of the City Attorney, Mayor Burris made the decision to have the flagpole removed. (SMF at ¶ 31; Burris Dep. at 39, 44.) During the staff meeting on the morning of April 24, 2000, the Mayor instructed James Tavenner, Public Works Director, to take the flagpole down the following morning. (SMF at ¶ 33; Burris Dep. at 38.) The flagpole was removed on April 25, 2000, and the Mayor issued an official press release that day, explaining that the City had removed the flagpole because it was in violation of the City Ordinance. (SMF at ¶ 34; Burris Dep. at 31–32, Ex. 30.) Although Burris contends that he did ask Tavenner if the flagpole could be removed without damaging it, Jackson claims that when the flagpole was returned to the Camp, the flagpole was scratched and damaged and approximately four feet of the pole had been sawed off at the bottom; that bottom part of the flagpole remains in the ground where it was erected. (Burris Dep. at 38; Jackson Dep. at 21–22.)

On the same day the flagpole was removed, April 25, 2000, citations were issued to Rusty Hamby, Miles Jackson, and Brent Griffin, another officer of the Camp, for the erection of the flagpole in violation of the City Ordinance. (SMF at ¶ 35.) After a hearing held on June 26, 2000, before Judge Mark Gaffney of the Stone

---

5. The memorandum also indicated that while the ordinance did explicitly so state, it should be understood that burial lots are for interring the dead, not for the erection of flag poles. (*Id.*) Apparently, the purpose behind purchasing the lots in question was to provide space near the burial spots of the Confederate dead to place a permanent flag.

Mountain Municipal Court, all three were found guilty of violating the Ordinance and were fined $200.00 each. (SMF at ¶ 36; Transcript of Hearing held June 26, 2000, before Magistrate Judge Gaffney, Stone Mountain Municipal Court, at 39.)

On April 26, 2000,[6] the day after the flagpole was removed, the plaintiffs, Miles Jackson, Rusty Hamby, and the Confederate Memorial Camp 1432, Sons of Confederate Veterans, filed the Complaint [1] in this action against the City of Stone Mountain, Mayor Charles Burris, and City Council Members Eleanor Heil, Billy Mitchell, Robert Smith, George Peet, Nan Nash, and Tawana Benton. The plaintiffs alleged that the defendants, acting under color of state law, deprived the plaintiffs of their constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments, and brought claims for damages and injunctive relief against all defendants pursuant to 42 U.S.C. § 1983.

Plaintiffs subsequently filed an Amended Complaint [26] on February 16, 2001, in which they asserted claims against only the City. In their Amended Complaint, plaintiffs brought an action against the City pursuant to 42 U.S.C. § 1983, alleging that the City violated their rights of freedom of speech and freedom of assembly under the First Amendment, and violated their right to due process of law under the Fourteenth Amendment. Plaintiffs also seek a declaratory judgment that the Cemetery Ordinance is unconstitutional, seek damages in the amount of $1,825.00 to replace the flagpole that was removed, and seek other declaratory and injunctive relief. Defendant City has filed a motion for summary judgment [44] on all of plaintiffs'

claims, which is now pending before the Court.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence [7] designating " 'specific facts showing that there is a genuine issue for

---

**6.** As noted above, April 26 is Confederate Memorial Day, and the Camp was planning to hold its annual Confederate memorial service in the Cemetery that evening. (*See* Plaintiffs' Motion for Preliminary Restraining Order [3].)

**7.** The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II. *Claims Against the Individual Defendants*

In their initial Complaint [1] filed April 26, 2000, the plaintiffs asserted their claims against the City of Stone Mountain, Mayor Charles Burris in both his individual capacity and his official capacity as May-or of Stone Mountain, and City Council Members Eleanor Heil, Billy Mitchell, Robert Smith, George Peet, Nan Nash, and Tawana Benton, in their individual and official capacities.

Plaintiffs subsequently filed an Amended Complaint [26] on February 16, 2001, in which they asserted claims against only the City. In their Amended Complaint, plaintiffs brought an action solely against the City pursuant to 42 U.S.C. § 1983, alleging that the City violated their rights of freedom of speech and freedom of assembly under the First Amendment, and violated their right to due process of law under the Fourteenth Amendment. Although the Amended Complaint did not name the individual defendants in the caption or the body, plaintiffs have not formally moved to voluntarily dismiss the individual defendants from the action, nor have the parties filed a stipulation of dismissal of the claims against the individual defendants.

In response to an inquiry from the Court about the plaintiffs' desire to pursue the claims against the individual defendants, the plaintiffs stated that they "agree that Mayor Burris should be dismissed" and that they "withdraw any opposition to dismissal of the individual defendants named in the original Complaint." (Pls.' Resp. [42] at 1.) Thus, the Court concludes that the plaintiffs have voluntarily abandoned their claims against the individual defendants that were asserted in the original Complaint.

Accordingly, all claims against the individual defendants Burris, Heil, Mitchell, Smith, Peet, Nash, and Benton, in both their individual and official capacities, are **DISMISSED with prejudice.** Plaintiffs' claims shall proceed solely against the City of Stone Mountain.

### III. First Amendment Claims Against the City of Stone Mountain

Plaintiffs have brought their claims against the City of Stone Mountain pursuant to 42 U.S.C. § 1983. 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

In order to establish a claim under Section 1983, plaintiffs must show a violation of a right secured by the Constitution of the United States, and also that the deprivation of that right was committed by a person acting under color of state law. *Cummings v. DeKalb County,* 24 F.3d 1349, (11th Cir.1994); *see also Graham v. Connor,* 490 U.S. 386, 393–394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (" § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

Plaintiffs' first claim against the City is that the removal and destruction of the flagpole violated their rights under the First Amendment to exercise their freedom of speech. They argue that the City's enforcement of the Cemetery Ordinance, as it was applied to them, violated their right to free speech, and second, that the Ordinance itself is unconstitutional on its face as an impermissible prior restraint of speech. Plaintiffs, however, seek no damages as a result of this First Amendment violation but instead seek injunctive and declaratory relief.

Under Fed.R.Civ.P. 65, a hearing on a motion for an injunction may be consolidated with a trial on the merits; because the Court finds that there are no disputed issues of material fact, and thus no need for a hearing on this matter, it will read "hearing" in this case as subsuming summary adjudication. *See Sons of Confederate Veterans, Inc. v. Glendening,* 954 F.Supp. 1099, 1101 (D.Md.1997).

### A. What Standard Governs the City's Ability to Regulate Protected First Amended Activity in Its Cemetery?

Leaving aside for the moment the question whether the erection of a flag pole, as opposed to the display of a flag, constitutes protected speech, the Court must determine what level of scrutiny must be applied to a municipality's efforts to regulate protected speech in its cemetery, as a city does not lose all rights to regulate speech merely because the property on which the speech is uttered is public property. As the Supreme Court has stated:

> Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. Recognizing that the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated, the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the

interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum.

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (internal quotes and citations omitted).

■■■ In short, the Government is not required to permit all forms of speech on property that it controls. *Warner v. City of Boca Raton,* 64 F.Supp.2d 1272, 1290 (S.D.Fla.1999) (citing *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)). Instead, as required by the Supreme Court, one must identify the type of forum in which the speech is occurring and apply the appropriate test for that particular forum. The Supreme Court has identified three types of fora: the traditional public forum, the limited or "designated" public forum, and the nonpublic forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *see also Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Traditional public fora include places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry,* 460 U.S. at 45, 103 S.Ct. 948; *see also Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Public streets, sidewalks, and parks fall into this category. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. In addition to traditional public fora, a public forum may be designated by the government for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain topics. *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948; *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Examples of limited public fora include public auditoriums or theaters. *See, e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). As long as the government retains the open character of the designated public forum, it is bound by the same standards that apply in a traditional public forum: to wit, any restriction on speech must be narrowly tailored to effectuate a compelling government interest. *Perry,* 460 U.S. at 45–46, 103 S.Ct. 948.

■■■ The third type of forum, a nonpublic forum, is public property that is not by tradition a forum that has been designated for public communication of ideas. "Not every instrumentality used for communication ... is a traditional public forum or a public forum by designation." *Cornelius,* 473 U.S. at 803, 105 S.Ct. 3439. Government property, such as airports, are considered nonpublic fora, even though they may contain some expressive activity on their grounds, because their primary purpose is not to promote the free exchange of ideas. *See, e.g., International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 682, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). In a nonpublic forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

■■■ There are few cases addressing the issue of whether a cemetery is considered a public forum, and the Court has uncovered no binding precedent on this issue. Two recent cases, however, have held that a cemetery is a nonpublic forum, and the Court finds these decisions persuasive. *See Griffin v. Dep't of Veterans Affairs,* 274 F.3d 818, 820 (4th Cir.2001); *Warner v. City of Boca Raton,* 64 F.Supp.2d 1272, 1291 (S.D.Fla.1999) (Ryskamp, J.), *question certified by* 267 F.3d 1223 (11th Cir. 2001). In *Warner,* in which the court was reviewing the propriety of a city regulation that prohibited the use of vertical markers

in a public cemetery, the court noted that cemeteries are clearly nonpublic fora, as their purpose is not to exchange ideas, but rather to provide a place for its citizens to bury their dead:

> [I]t seems quite obvious that cemeteries are nonpublic fora. It certainly cannot be said that cemeteries have traditionally been used for assembly and the free exchange of ideas. The primary purpose of cemeteries is not to facilitate the free exchange of ideas but, rather, to provide a place for citizens to bury and honor their dead. Accordingly, the Court concludes that the Cemetery is a nonpublic forum for First Amendment analysis.

*Warner*, 64 F.Supp.2d at 1291. Likewise, in *Griffin*, the Fourth Circuit was called on to review, as applied to a national cemetery containing only the remains of Confederate soldiers, the constitutionality of a regulation that prohibited the erection of a permanent flag pole from which the Confederate flag would fly. The Court concluded that the cemetery was a nonpublic forum:

> We agree with the VA that that purpose is to honor, as Americans, in tranquil and nonpartisan surroundings, those who have given their lives to the Nation.

*Griffin*, 274 F.3d at 821.

The Court agrees with these decisions and concludes that the Cemetery is a nonpublic forum. Contrary to plaintiffs' argument, the fact that the City allows the owners of burial plots to erect monuments or memorials on their plots does not transform the Cemetery into a public forum for the exchange of ideas. Although some of those monuments or memorials may indeed contain some symbols that are intended to convey some religious or secular meaning, such limited allowance of expression does not convert the Cemetery into a public forum. The Supreme Court has held that the government must indicate a clear intent to designate a public forum, and this Court finds no such intent here. First, the public at large is not granted any right to the expression of ideas in the Cemetery; only citizens who purchase burial plots there are allowed to construct appropriate monuments or memorials on those plots. Moreover, the purpose of a cemetery, to provide a suitable location for citizens to bury and honor their dead, typically in a tranquil setting, seems squarely at odds with the notion that it should be used as a forum for public debate and the free exchange of ideas.

> The First Amendment does not guarantee access to property simply because it is owned or controlled by the government. We will not find that a public forum has been created in the face of clear evidence of a contrary intent, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.

*Cornelius*, 473 U.S. at 803, 105 S.Ct. 3439 (internal quotes and citations omitted).

 Accordingly, because the Cemetery is a nonpublic forum, the City is authorized to place certain restrictions on speech in the Cemetery, without a showing that the restrictions are narrowly tailored to effectuate a compelling government interest. Instead, in the case of a non-public forum, a restriction on speech may be upheld if the regulation is reasonable and viewpoint neutral. *Perry*, 460 U.S. at 49, 103 S.Ct. 948. "A regulation is viewpoint neutral as long as it is 'not an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" *Warner*, 64 F.Supp.2d at 1291 (citation omitted). Further, "a regulation 'need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'" *Id.*

### B. Is the City's Ordinance Constitutional?

 Plaintiffs contend that the cemetery ordinance is unconstitutional, on its face, and, as applied. In making a facial challenge, the plaintiffs must establish that no set of circumstances exists under which the law would be valid. *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir.2000). In an "as applied" challenge, however, one evaluates the constitutionality of a statute by examining how it is applied to the particular circumstances at issue. *Griffin v. Dep't of Veterans Affairs*, 129 F.Supp.2d 832, 837 (D.Md.2001) ("*Griffin I*"). Further, the remedy for each type of violation is different. If an ordinance is unconstitutional as applied, the State may still conceivably enforce it in different circumstances; if the ordinance is unconstitutional on it face, however, the State may not enforce it under any circumstances. *Id.* (citing *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir.1997)).

In erecting their flag pole, the plaintiffs purportedly ran afoul of two provisions of the City's cemetery ordinance. Specifically, Section 6–8, which sets out the "Rules for construction and maintenance, provides in pertinent part that:

1. **All work must be approved in advance by the sexton** including that done by private owners, contractors, and monument companies.

2. Monuments, paving, curb, wall, coping or any other edifice constructed on cemetery lots **shall be made of marble, granite or other natural stone material**. No brick or cinder block material shall be allowed in the construction or repair of any cemetery lot or monument. Steel reinforced concrete walls shall be allowed upon approval by the sexton.

3. All headstones and markers shall have proper foundations no wider than three feet.

4. No fence, railing, or enclosure of any kind will hereafter be allowed to be erected in any part of the cemeteries unless previously approved by the sexton. The erection of vaults or tombs wholly or partly above the ground will not be allowed without special permission from the sexton. Applications for permission to build such structures must be accompanied by plans and specifications for approval.

5. No marble or stone enclosure or box shall be erected or built over any graves on any lot unless approved by the sexton. In cases where it is desired to duplicate those structures already on a lot, such enclosures or boxes must be supported by foundations at the center of the sides as well as at the ends. Applications for permission to build such structures must be accompanied by plans and specifications for approval.

6. Guy ropes may be attached to trees or posts only by special permission from the sexton, sufficient padding to be used in all cases. Planks must be laid on the sod where barrows or trucks are used to move stone.

7. No mortar or cement shall be mixed on the roadways or paths. Boards must be used in every case. No monumental work shall be delivered at the cemetery until the foundation is completed, and the contractor is ready to proceed with the work. Notice must be given at City Hall before any monumental work is brought in the cemetery.

8. No stone work shall be brought into the cemetery on weekends except by permission of the sexton.

9. The sexton shall have the authority to enter any lot or grave site and issue stop work orders in connection with any provision of Section 6.8. The sexton shall also have the authority to remove any dead or dangerous tree, shrub, vine,

structure, or any object contrary to the regulations contained in Section 6.8."

(Burris Dep., Ex. 17, at Sec. 6–8 (emphasis added).)

■■■ The first question is whether the provision requiring advance approval by the sexton in Paragraph 1 is unconstitutional on its face because it confers unbridled discretion on the sexton to approve work done on burial sites. In order to survive First Amendment scrutiny, a licensing or variance scheme that give public officials the power to decide whether to permit expressive activity must meet two criteria: (1) contain precise and objective criteria for decisionmaking and (2) require prompt decisions. *Warner*, 64 F.Supp.2d at 1292. Whether section 1 runs afoul of the above requirement, however, depends on whether one construes the provision as allowing the sexton to regulate expressive activity. A plausible reading of the entire section 6–8 suggests that the ordinance does not intend to confer that authority. Specifically, this Court does not construe the section as giving the sexton the power to disapprove the wording of inscriptions on monuments, the images or symbols etched on such monuments, or any other expressive activity that one might pursue in a burial site. Thus, the Court does not read the ordinance to allow the sexton to veto the engraving of a Star of David, a cross, or a Confederate battle flag, for example, or prohibit monuments carved in those or other symbolic shapes. *Cf. Warner*, 64 F.Supp.2d at 1293 (a cemetery ordinance that generally prohibits vertical markers, but that allows the sexton discretion to waive that provision, whenever he wishes, creates the possibility that a sexton partial to the Christian faith could allow an exception for crosses, while refusing a variance for Stars of David; such potential for content-based discrimination runs afoul of the First Amendment.)

Instead, the Court reads paragraph 1 in connection with the other eight paragraphs in section 6–8, all of which pertain to details concerning construction and engineering type specifications. For example, paragraph 2 specifies the type of materials that can be used in any construction on the lot. Paragraph 3 addresses the requirement for a proper foundation for any markers and the maximum width of such foundations. Paragraph 4 prohibits the building of a fence or enclosure or the erection of above ground vaults, absent the permission of the sexton. Paragraph 5 prohibits the building of a marble or stone enclosure over any grave unless approved by the sexton, unless such structure is necessary to duplicate an existing such enclosure, in which case plans and specifications must be submitted. Paragraph 6 deals with the need for permission from the sexton to use guy ropes on tree and the need to use padding and planks when trucks are used to move stone. Paragraph 7 prohibits the mixing of cement on roadways or the delivery of monumental work before the foundation is completed. Paragraph 8 prohibits the delivery of stone work on the weekend except with the permission of the sexton. Finally, paragraph 9 gives the latter the authority to enter a lot to issue stop work orders or to remove objects that are contrary to the regulations contained in section 6.8.

Only two provisions give the sexton the power of approval over work that could conceivably involve expressive activity. That is, paragraphs 4 and 5 disallow the erection of above ground vaults or stone enclosures, but do provide for an exception to this prohibition, if approved by the sexton. Although the Court assumes that the intent behind these provisions is not to give the sexton the power to make an exception based on the type of expressions on the vault, it is perhaps conceivable that a sexton could allow a structure in the shape of a cross, but not in the shape of a

Star of David,[8] for example, as discussed in *Warner, supra.* Accordingly, these two paragraphs arguably delegate overly broad discretion to the decision maker. *See Warner,* 64 F.Supp.2d at 1292. Nevertheless, these two provisions have no pertinence to the facts at issue in this litigation and, indeed, the Court can sever unconstitutional provisions in a statute, which it would do as to paragraphs 4 and 5, if necessary.[9] *See id; Sons of Confederate Veterans, Inc. v. Holcomb,* 129 F.Supp.2d 941, 949–50 (W.D.Va.2001) (Kiser, J.).

Thus, as to the provision in paragraph 1 indicating that all work must be approved by the sexton in advance, the Court construes this paragraph as meaning that the sexton's power to disapprove work is no greater than that power allowed him in the paragraphs 2–8. That is, if the owner of the plot does not contravene any of these provisions, the sexton has no power to disapprove the structure or work done on the site. Nevertheless, even construed in this manner, there is still no time limit on the sexton's duty to approve proposed

work, which omission is typically problematic for a defendant when faced with a facial challenge based on procedural deficiencies.[10] *See United States v. Frandsen,* 212 F.3d 1231, 1238–1240 (11th Cir.2000); *see also Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (explaining the procedural safeguards that must be in place, including the burden of proof falling on the government to justify the prior restraint, the existence of a specified brief time period for the restraint prior to a judicial determination, and an avenue for prompt judicial review of the censor's decision).

Thus, there is an arguable facial challenge to the provision requiring approval of all work in advance by the sexton because of the absence of time constraints on the sexton's approval. It is in the "as applied" challenge, however, that defendants are most vulnerable with regard to this particular provision. That is, as noted *supra,* the requirement of approval by the sexton was honored in the breach. Specifically, Tug Tuggle, the sexton,[11] has testi-

8. It is a bit of a stretch, however, to actually envision that the sexton would be in a position to know what kind of expressions might be on a vault when the request is made. Moreover, most vaults or above ground tombs are of a uniform, non-symbolic shape. This Court has never seen a vault that is in the shape of a cross or Star of David. The Ordinance does not require a disclosure of the symbols to be inscribed on the vault and the Court doubts that the sexton would know that fact when he was reviewing the plans and specifications.

9. The Court does not actually strike down these paragraphs as unconstitutional as they have not been challenged in this litigation.

10. Having said this, the Court notes that there was never any problem with the sexton taking too long to review a request as it is clear from the record that virtually no one every asked the sexton's permission to do work on a burial site. (*See* discussion of facts, *supra* at 10; Tuggle Dep. at 11.) Indeed, the sexton did

not even have his primary residence in Stone Mountain and he would have frequently been unavailable, had a request ever been made. Accordingly, although required by case authority, this hypertechnical analysis of an ordinance passed by a small town city council with a volunteer sexton and an informal and collegial method of doing business concededly might appear a bit overdone in any context but that of a First Amendment analysis.

11. Deposition testimony reflects Mr. Tuggle to be an amiable and colorful figure in Stone Mountain, who had been named sexton because of his longstanding love of the cemetery and his family's efforts to clean it up in years past when it had fallen into a state of decline. (Tuggle Dep. at 5–7.) Mr. Tuggle's efforts with regard to the cemetery are a labor of love, as he receives no pay for being a sexton and has indicated that he would just as soon pass up the honorary title if he is going to continue to be hassled with depositions and the other pitfalls of litigation (*id.* at 32), a reaction with which the Court can empathize.

fied that less than ten per cent of the people who put up a monument ever consult him and, on those few occasions when he has been advised in advance, his only concern related to the type of material that the individual intended to use in building the monument. (See discussion, *supra*, at 10.) Moreover, Tuggle was not concerned that people failed to consult him, as he noted that he was not going to police the cemetery. (*Id.*) Indeed, as noted, Mr. Tuggle has a primary residence in Jasper, Georgia, although he still retains a home in Stone Mountain. (*See id.* at 4–5.) Further, no written application form was ever generated, so there was no formal mechanism in place to obtain Mr. Tuggle's approval, had one wanted to do so. (*Id.* at 14.)

Therefore, the record is clear that prior approval of work was not a requirement that the defendant City ever insisted on for any other burial plot owner other than plaintiffs. Moreover, it is also clear that, while a flag pole, itself, might not represent protected expression, the City was aware that plaintiffs eventually intended to fly a Confederate battle flag from that pole; indeed, defendant does not dispute that the display of a flag constitutes protected activity. Accordingly, to the extent that the City bases its contention that plaintiffs had violated the ordinance on plaintiffs' failure to obtain prior approval from the sexton, pursuant to paragraph 1, it is clear that the City insisted only that plaintiffs, and no one else, comply with that provision. As the only distinction between plaintiffs and others who had erected structures was plaintiffs' intent, ultimately, to engage in protected expression, paragraph 1, as applied in this case, was applied in a manner that was not viewpoint neutral. Hence, the City cannot base its argument that plaintiff's flagpole failed to comply with the ordinance on plaintiff's failure to obtain the prior approval of the sexton.

 There is a second provision of the ordinance on which the City bases its contention that plaintiffs' erection of a flag pole violated that ordinance. Specifically, paragraph 2 provides that:

2. Monuments, paving, curb, wall, coping or **any other edifice constructed on cemetery lots shall be made of marble, granite or other natural stone material**. No brick or cinder block material shall be allowed in the construction or repair of any cemetery lot or monument. Steel reinforced concrete walls shall be allowed upon approval by the sexton . . . .

(Burris Dep., Ex. 17, at Sec. 6–8 (emphasis added).) [12] There appears to be no dispute that plaintiffs' flag pole was not made out of the prescribed materials, but, as with most flag poles, was made out of a metallic substance. Further, while the word "edifice" does not appear to be the most apt word to describe a flagpole, the Court concludes that the requirement of the use of certain materials was intended to be inclusive and that the word "edifice" was intended to serve as a "catch-all" phrase to describe any construction that might be put on a plot. Accordingly, plaintiffs' flagpole violated paragraph 2 because it was not made of the proper materials.[13]

12. Defendants also argue that the ordinance prohibited the erection of flagpoles. (*See* Def. Br. [44] at 12–13.) This Court disagrees. While it is true that the ordinance never mentioned flagpoles, an omission is not the same thing as a proscription. Accordingly, any prohibition of plaintiffs' particular flagpole in the ordinance must arise out of paragraph 2 for defendants to succeed on their argument that plaintiffs' flagpole was in violation of the ordinance.

13. One should perhaps note that the use of improper materials did not appear to be uppermost in the minds of Council members when they first became aware that the plaintiffs had come in by night and had erected a flagpole. Instead, these members were upset

Moreover, unlike with paragraph 1, there is no evidence that the City ever applied paragraph 2 inconsistently. That is, there is no evidence that the City had allowed other users to erect any type of metallic edifice, including a flagpole. The undisputed evidence was that it had been at least ten years since there had been a flagpole in the cemetery. (Discussion, *supra*, at 7.) Further, the only time that Tuggle had ever required some one to tear something down was when the object was made out of an improper material. (Discussion, *supra*, at 10.) Thus, the Court concludes that plaintiffs' flagpole was in violation of that part of the ordinance restricting the type of material used in a plot and that this provision of the ordinance does not run afoul of an "as applied" challenge, due to the fact that it had not been applied inconsistently.

There are a couple of factual wrinkles in this case that, while they do not change the Court's conclusion, do deserve some discussion, however. The first matter is the significance of the question whether Tuggle actually gave his permission to plaintiffs to erect a flagpole. Plaintiff Hamby indicates that prior to beginning fund raising efforts to purchase the plots, he had conversed with Tuggle about the plaintiffs' wish ultimately to erect a flagpole on any such plot. According to Ham-

by, Tuggle indicated, with some rather colorful examples, that he believed that Hamby could put anything that he wanted on his property.[14] (Dep. of Hamby at 15–16.) The record is not clear as to when the plaintiffs purchased the plots, but the timing of the conversation would suggest that it occurred before enactment of the revised ordinance in September, 1999, as only seven months later plaintiffs had erected its flagpole.

It is undisputed, however, that plaintiff Hamby did have a conversation with Tuggle shortly before erection of the flagpole, at a time when the 1999 ordinance would have clearly been in effect. Both parties agree that Tuggle was walking his dog in the cemetery when he noticed surveying tapes, in the shape of an X, on the plots owned by plaintiffs. Thinking the X was for the inscription of a battle flag on a granite slab, which Tuggle thought would "look great," Tuggle called Hamby to inquire about the tape. (Tuggle Dep. at 20.) According to Tuggle, Hamby said, "You don't want to know," at which point Tuggle let the matter drop. (Discussion, *supra*, at 11.) According to Hamby, however, the latter told Tuggle that the plaintiffs were going to erect a flagpole, at which point Tuggle said, "Oh, hell, I don't need to know about this." (*Id.* at 11–12.)

that the plaintiffs, whose request to erect a flagpole had been declined in 1994, had, stealthily and without anyone's permission, erected this pole. (Heil Dep. at 10–11; Nash Dep. at 9–10.)

No matter the Council's lack of familiarity with its own ordinance or the fact that the one violation of the ordinance that this Court has recognized is not the violation that initially triggered the Council's agitation, plaintiffs did violate this paragraph of the Ordinance. Further, unlike as with paragraph 1, there is no indication that the City had ever applied paragraph 2 inconsistently. (*See* discussion *supra*.) Finally, prior to removing the pole, the City's counsel delivered a memorandum

indicating that plaintiffs were in violation of that part of section 6–8 requiring prior approval and that part forbidding the construction of any edifice not made of natural material. (Burris Dep., Ex. 11). In addition, in his deposition testimony, Mayor Burris indicated that one of the grounds for removing the flagpole was plaintiffs' failure to request a variance from the ordinance. (Burris Dep. at 45.)

14. Tuggle had been unaware of the City's decision in 1994 to reject plaintiffs' efforts to erect a flagpole, as he indicated that the City does not consult with him much. (Tuggle Dep. at 17.)

Thus, even under plaintiffs' version, although likely aware of plaintiffs' intentions, Tuggle did not actually give his approval, instead indicating that he did not want to be involved in the matter. Moreover, even had Tuggle approved the flagpole, the Court does not read anything in the ordinance that would give the sexton the authority to give permission to erect a structure whose material composition did not comply with paragraph 2, with the exception of a steel reinforced concrete wall, which would be allowed only with the permission of the sexton. Thus, under this construction of the ordinance, the sexton would have no authority to waive this provision.

A second matter that warrants some discussion is the question whether the Mayor [15] and Council's dismay that plaintiffs were going to fly a Confederate Battle Flag on the plots somehow infects the City's otherwise valid conclusion that the flagpole violated the ordinance. The Court concludes that it does not. Had the City allowed others to erect a flag pole, then one could reasonably infer that the City's enforcement of the prohibition on the use of certain materials, which effectively proscribed flagpoles, was not viewpoint-neutral and that, as applied, paragraph 2 was unconstitutional. Yet, there is no evidence that the City had ever allowed anyone else to erect a flagpole.

It is true that, at the council meeting [16] held after the plaintiffs had stealthily erected the flagpole, one of the council-

women had suggested that plaintiffs compromise and fly the First National Flag, or official flag, of the Confederacy, not the Confederate Battle Flag. Further, this possibility was broached with plaintiff Hamby, who rejected it. (Dep. of Burris at 24; Dep. of Nash at 7–8). Although it is commendable that the City might reflect a spirit of compromise in resolving this dispute with plaintiffs, this one fact is nevertheless the single weakest point in the City's case. Indeed, while a willingness to compromise is generally an asset in almost all other endeavors, in First Amendment litigation, a municipality's attempted direction concerning the particular kind of speech to be uttered can bespeak an effort to control the content of the communication, which can be fatal under a First Amendment analysis.

Nevertheless, the Court concludes that the Council's willingness to discuss with plaintiffs the flying of a different Confederate flag does not eviscerate the former's otherwise correct conclusion that plaintiffs were in violation of the ordinance. First, plaintiffs do not occupy the high ground on this particular matter,[17] as it was their stealthy erection of the flagpole, ultimately determined to be in violation of paragraph 2, that led to the need for any discussion. It seems fairly certain that had the plaintiffs requested a variance in the ordinance to allow them to erect a flagpole, the Council would have denied that request, as they denied it in 1994. Second, as the City ultimately failed to authorize anyone, in-

---

**15.** As correctly noted by plaintiffs, in a 1998 magazine article, Mayor Burris had boasted that he had voted down the 1994 request by plaintiffs to fly a Confederate flag, noting that there were also black people buried in that cemetery and that he would "be damned if I was going to allow that flag to fly over their graves." (Discussion, *supra*, at 7.)

**16.** Actually, there was no formal meeting as a quorum was not present, but those members

in attendance did discuss the matter. (*See* discussion, *supra*, at 15; Burris Dep. at 26.)

**17.** Conversely, defendant does not occupy the high ground on the "takings" claim, as it destroyed plaintiffs' property, without any prior notification to plaintiffs and without allowing plaintiffs to be heard. *See* discussion *infra* at 60–65.

cluding the plaintiffs or anyone else, to erect a flagpole or to fly any type of flag, it is now a matter of speculation as to whether it would have actually permitted the plaintiffs to fly any flag. In short, to capitalize on the Council's potential offer in this litigation, the plaintiffs should have accepted it.[18] Thus, the Court does not construe the City's attempted effort to negotiate with plaintiffs to be a waiver of its ability to rely on paragraph 2 of the Revised Ordinance, upon the plaintiffs' rejection of the offer to negotiate.[19]

Further, while the City has effectively banished flagpoles, it would not be accurate to state that the City has refused to allow protected expressions concerning the Confederacy or Confederate flags. That is, plaintiffs had traditionally flown and displayed Confederate flags in the cemetery during Confederate Memorial Day celebrations. (Burris Dep. at 67.) Indeed, prior to these celebrations, the plaintiffs place individual Confederate battle flags on the grave sites of Confederate soldiers, which flags are left there by the City, unless removed by a passerby. (Hamby Dep. at 17; Jackson Dep. at 16–17.) As Councilwoman Heil stated, "this has nothing to do with the flag, anyway. It's the flagpole. We have never said they couldn't have flags in there. We have said they couldn't have a flagpole. Not one time did we ever say that could not put flags up. They've had plenty of flags." (Heil Dep. at 11.)

This explanation by the councilwoman brings the Court to the final question here, which is whether a municipal cemetery can prohibit the owner of cemetery plot from erecting a flagpole on that plot. If such a restriction is impermissible, then defendant's restriction of construction materials to natural materials would be vulnerable to an "as applied" challenge, as it appears that most flagpoles will not comport with that materials specification. At the outset, the Court notes that paragraph 2 does not seem to have been enacted as an indirect means to prohibit flagpoles. Indeed, as indicated *supra*, until pointed out by the City Attorney, the Council did not initially seem to even focus on that fact that a flagpole would run afoul of this provision. Instead, the motivation behind the enactment of paragraph 2 seems to have been a sincere intention to ban any non-natural products from the cemetery. While the primary concern behind the ordinance was apparently to prohibit the use of materials that might crumble or deteriorate, there is evidence that the Council considered unde-

---

18. In retrospect, the possible use of the First National Flag, instead of the battle flag, is a matter on which both parties erred, as a strategic legal matter. That is, as noted, the City arguably undermined its position by its willingness to negotiate on the type of flag to be flown. The plaintiffs erred, however, by not pursuing this olive branch by the City. Specifically, had the plaintiffs actually flown the First National Flag for a period of time, the City would have been hard pressed later to banish plaintiffs' flag pole, if the latter had substituted the Battle Flag, without running afoul of an argument that the City's regulation was no longer content-neutral. To their credit, however, neither side has tried to employ a scorched earth litigation posture. Plaintiffs have been modest and reasonable in their demanded relief; the City, as noted, wanted to work this matter out without a confrontation.

19. Albeit on different facts, the Fourth Circuit arrived at the same conclusion in *Griffin, supra*. There, in a national cemetery of Confederate veterans, the VA allowed the Confederate Flag to be flown on the cemetery's flagpole on two days a year—Memorial Day and Confederate Memorial Day—but refused to allow the plaintiff to erect a flagpole on which to fly the Confederate flag year round. The Fourth Circuit did not conclude that this "compromise" position by the VA waived its right to insure that its own message was not garbled, which result could occur if the Confederate flag were flown year round. 274 F.3d at 822–23.

sirable the use of metal objects. According to Mayor Burris, there was a dislike of metal objects and a desire for signature building materials in order to obtain a national register designation. (Burris Dep. at 65.) Councilman Peet noted an exclusion of metal construction is based on the City's wish to keep the look of an historical cemetery and further on the fact that metal can rust and is not as permanent as masonry. (Peet Dep. at 10.) Indeed, Tug Tuggle, in response to a hypothetical question whether he would have approved a flagpole had he been asked permission, indicated that he was unsure. Specifically, while he would have been inclined to allow such a pole, as he had Confederate ancestors and was apparently sympathetic to the flying of the Confederate flag, he would have been concerned that a flagpole could be struck by lightning and could cause damage. (Tuggle Dep. at 16.)

■■■■ Thus, a policy of prohibiting flagpoles [20] can be justified on aesthetic grounds that are uniformly applicable to all flagpoles. Further, this policy does not eliminate the ability of plaintiffs or others to display the flag on individual plots or to engrave a depiction of the flag on monuments or plaques. Indeed, as noted, the City has apparently never deterred plaintiffs and others from such expressive conduct. Accordingly, such a prohibition appears both reasonable and viewpoint neutral. *See Warner v. City of Boca Raton*, 64 F.Supp.2d 1272, 1291 (S.D.Fla.1999) (prohibition of vertical markers in a public cemetery was permissible, even though such markers contain expressions protected by the First Amendment, as one can still convey the same expressions on a horizontal marker and as the regulation otherwise reason-

ably serves legitimate goals of the cemetery).

Moreover, a recent case from the Fourth Circuit indicates that a prohibition of flagpoles can be justified even if the primary motivation is the desire to exclude the flying of a particular flag and thereby avoid the public tumult that might result from such displays. In *Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818 (4th Cir. 2001), the plaintiff wished to erect a permanent flagpole, from which he would fly the Confederate flag in a national cemetery in Maryland that contained the remains only of Confederate soldiers. The Fourth Circuit rejected the plaintiff's challenge of regulations issued by the Veterans' Administration ("VA"), which prohibited such a permanent display, holding that these regulations were reasonable. The Court noted that the purpose of the cemetery was to honor, as Americans, in tranquil and non-partisan surroundings, those who have given their lives to the Nation. *Id.*, 274 F.3d at 821. The Court noted that the VA could justifiably worry that other groups might want to fly flags. Further, the Court faced head on the plaintiff's contention that the regulation was suspect because it was triggered by a concern that the Confederate flag would cause controversy. The Court noted that such a belief was reasonable and that such controversy could undermine the VA's goal of keeping the cemetery free from partisan conflict. *Id.* at 823. While the plaintiffs argued that the VA's persistent references to the Confederate flag as "a symbol of racial intolerance and divisiveness clearly demonstrate[d] that [the VA is] choosing, and advancing the viewpoint of those offended by the flag over the viewpoint of those proud of the flag," the Court held that,

---

**20.** As noted, the revised ordinance does not explicitly prohibit flagpoles. Accordingly, if plaintiffs or others had erected a flagpole made out of natural materials, there is nothing in the ordinance to prohibit the erection of that structure.

although it was not clear that the VA was indeed promoting a particular viewpoint, "the VA is allowed to choose sides as far as its own message is concerned." *Id.* at 824.

Aspects of plaintiff Griffin's case were both stronger and weaker than the plaintiffs in this case. On the one hand, the cemetery at issue there included only the remains of Confederate soldiers, thereby bolstering the plaintiffs' desire to fly a Confederate flag. The Stone Mountain Cemetery contains the remains of many individuals who never fought for the Confederacy, and it is apparently still used today for burial purposes. Plaintiff Griffin's facts were arguably weaker than the plaintiffs here, however, because the former wanted to use the VA's own land on which to erect a flagpole, whereas the plaintiffs in this action actually own the plot on which they wished to place the flagpole.

Nevertheless, this Court concludes that the reasoning of *Griffin* is applicable to this case. Thus, had the City expressly prohibited the erection of flagpoles on individual lots, this Court assumes,[21] under the reasoning of *Griffin,* that such a prohibition would have been valid, even if motivated, in part, by a desire to diminish the partisan controversy and rancor that the establishment of a permanent flag display might engender. Whereas the display of

Confederate flags on individual graves or the engraving of the battle flag on monuments constitutes private, protected expression that could not be confused by the public as an expression of allegiance by the City, itself, the display of a Confederate flag, flown from a tall, permanent flag pole, could suggest to the public that the City was holding itself out as a Confederate cemetery or that it was aligned with the viewpoint of the Confederacy.[22] While the Court will assume that the City is free to espouse the latter viewpoint if it wishes, it is equally free, as the VA was in *Griffin,* to adopt a message that the cemetery is intended to be a "tranquil and non-partisan" refuge. *Griffin,* 274 F.3d at 821.

In conclusion, this Court concludes that plaintiffs violated paragraph 2 of the Revised Ordinance when they erected this flagpole. The Court further concludes that this provision is not facially unconstitutional nor unconstitutional when applied to these facts. Therefore, plaintiffs' Section 1983 claims based on First Amendment grounds are **DENIED**.[23]

### IV. *Plaintiffs' Due Process and "Takings" Claim*

Plaintiffs' final claim under Section 1983 is that they were deprived of their property, the flagpole, without due process of law, in violation of the Fourteenth Amend-

---

**21.** Neither plaintiffs nor defendants have addressed the applicability of *Griffin* 's reasoning to this case, as it was published several months after the parties had submitted their respective briefs on the pending motions. The Court assumes that the parties are unaware of the decision as they have not filed any supplemental briefs concerning its holding and as the Court found the case on its own.

**22.** The limited testimony on this matter suggests that the flag pole was erected at a prominent place, visible to traffic that passes by the cemetery. Specifically, Councilwoman Heil

indicated that she was startled when she saw the flag pole, while she was stopped at a red light in front of the cemetery. (Heil Dep. at 8.)

**23.** In their Amended Complaint, plaintiffs argue not only that their right to freedom of speech was violated, but also that their First Amendment right to freedom of assembly was violated. Plaintiffs have not presented any argument in their brief with respect to this claim, and thus, the Court deems this claim abandoned. *See Bute v. Schuller Int'l, Inc.,* 998 F.Supp. 1473, 1477 (N.D.Ga.1998).

ment, and also that the defendant's removal and damage to the flagpole constituted an unlawful "taking" of the plaintiff's property, in violation of the Fifth and Fourteenth Amendments. The Fifth Amendment provides, in relevant part, that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. V. The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty or property without due process of law." U.S. CONST. AMEND. XIV. The gist of plaintiffs' argument is that the defendants, stealthily and without any notice, to plaintiffs removed their flagpole from plaintiffs' own property and, in the course of doing so, severely damaged that property.

Plaintiffs allege that the City's actions in removing the flagpole and prosecuting them for the alleged violation of the Cemetery Ordinance were carried out under color of state law and deprived them of their rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution. They seek damages pursuant Section 1983 for the alleged violation of these rights. Defendant contends first that the City cannot be held liable for the actions of Mayor Burris in removing the plaintiff's flagpole, and second, that even if the City is liable for the actions of Mayor Burris, the plaintiffs were provided with proper notice and an opportunity to be heard before the decision was made to remove the flagpole, and therefore, their due process rights were not violated.

### A. *Municipal Liability under the Monell Doctrine*

As discussed above, plaintiffs' claims are now proceeding against the City of Stone Mountain as the sole defendant. The Supreme Court has held that municipalities and other local governmental entities are considered "persons" that may be sued

under Section 1983. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

*Monell*, 436 U.S. at 690, 98 S.Ct. 2018.

 Municipalities may only be held liable for acts that can properly be said to be acts of the municipality itself, however; a plaintiff cannot ordinarily hold a municipality liable under 42 U.S.C. § 1983 for the actions of its employees because Section 1983 does not provide for liability under a theory of *respondeat superior. Id.*, 436 U.S. at 691, 98 S.Ct. 2018. Instead, a municipality may generally only be held liable under Section 1983 when the plaintiff shows that the deprivation of constitutional rights was made pursuant to an official "custom" or "policy." *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir.1991); *Fundiller v. Cooper City*, 777 F.2d 1436 (11th Cir.1985). To meet the burden of showing a policy or custom, plaintiffs must ordinarily allege a "series of incidents of unconstitutional conduct suggesting the existence of a widespread practice that ... constitutes a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 118 (1988).

In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court explained that the *Monell* decision did *not* mean that a

municipality may never be held liable for the single act of a municipal official:

> The "official policy" requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.

*Pembaur,* 475 U.S. at 479, 106 S.Ct. 1292.

■ The Court went on to explain that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.... [W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is taken only once or to be taken repeatedly." *Pembaur,* 475 U.S. at 480–481, 106 S.Ct. 1292. "Thus, liability may arise from 'a course of action tailored to a particular situation and not intended to control decisions in later situations' ... provided that 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Scala v. City of Winter Park,* 116 F.3d 1396, 1399 (11th Cir.1997) (quoting *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292). Thus, as long as the decisionmaker's decision is final, the municipality can be held liable under Section 1983. *Id.* at 1401; *accord McMillian v. Johnson,* 88 F.3d 1573, 1577 (11th Cir.1996), *aff'd sub nom McMillian v. Monroe Cty., Ala.,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

■ The determination of whether a municipal employee is the final decisionmaker is a question of law. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Brown v. City of Fort Lauderdale,* 923 F.2d 1474,

1480 n. 10 (11th Cir.1991). Moreover, "[w]hether a particular official has final policymaking authority is a question of state law," and should be determined by looking "to state and local positive law, as well as custom and usage having the force of law." *Brown,* 923 F.2d at 1480; *McMillian,* 88 F.3d at 1577.

■ In the instant action, defendant argues that plaintiffs have failed to establish a Section 1983 claim against the City of Stone Mountain because they have failed to establish that the Mayor's actions were taken pursuant to any custom or policy of the City. This argument ignores the Supreme Court's holding in *Pembaur* and its progeny. As noted above, plaintiffs may establish a claim against the City by showing that the actions at issue were taken by a final policymaker. This case does not involve the actions of a low-level city employee; quite the contrary, the decisions at issue in this action were made by Mayor Burris, the Chief Executive Officer of the City, and it was lower-level employees who carried out his direct orders to remove the plaintiffs' flagpole.

Defendant does not dispute that the Mayor himself was the ultimate decisionmaker with respect to the removal of the flagpole; indeed, defendant admits as much · in its own Statement of Facts. (SMF at ¶¶ 31–33.) The overwhelming evidence reflects that the Mayor made this decision and took this action of his own accord; unlike the decision not to allow the SCV to erect a flagpole in 1994, this time, there was no formal vote of the City Council (although the Mayor likely acted under the belief that the City Council supported his decision to remove the flagpole). Indeed, there was not even a consultation with the sexton, who disavowed any role in the removal of the flagpole whatsoever. Furthermore, on the very day the flagpole was removed, the Mayor himself typed up on his own home computer an official press

release stating: "On Tuesday, April 25, 2000, **the City of Stone Mountain** removed an aluminum flagpole from the City Cemetery which was erected on two burial lots by the members of the Sons of Confederate Veterans ...." (Burris Dep. at 32, Ex. 13 (emphasis added).) Thus, although the Mayor publicly proclaimed that the flagpole was removed by "the City," defendant now argues that the Mayor's actions were actually his alone and can not be considered an official act of the City for the purposes of a Section 1983 claim.

Moreover, although the Cemetery Ordinance states that the sexton has the authority to remove structures in violation of the Ordinance, it says nothing about the Mayor having such authority, particularly in the absence of any cooperation or consultation with the sexton:

> The sexton shall have the authority to enter any lot or grave site and issue stop work orders in connection with any provision of Section 6.8. The sexton shall also have the authority to remove any dead or dangerous tree, shrub, vine, structure, or any object contrary to the regulations contained in Section 6.8.

(Burris Dep., Ex. 17, at Sec. 6–8.) Nevertheless, Mayor Burris believed that he had the authority to remove the flagpole under the powers granted him by the City Charter. (Burris Dep. at 40, 44.) According to Mayor Burris, he had the authority to remove the flagpole because, pursuant to the City Charter, the Mayor was responsible for the day-to-day operations of the city and all of its departments, and also to see that all laws, ordinances, and rules are executed. (*Id.* at 44.) Furthermore, the Ordinance grants authority over the Cemetery to the City Manager or his "designee," and because the City did not have a City Manager, that responsibility fell to the Mayor. (*Id.*)

Thus, although Mayor Burris believed that he had the authority to make the decision to remove the flagpole, the defendant City now argues to this Court that, in essence, the Mayor had no such authority and was acting completely on his own behalf and not on behalf of the City when he made that decision; thus, the City can not be held liable under Section 1983 for the Mayor's actions. The Court is unpersuaded by this argument. Indeed, it is hard to imagine more compelling circumstances in which the single action or decision of an individual city official can be imputed to the city itself for the purpose of a Section 1983 claim.

The Court thus concludes that the Mayor acted as the final policymaker for the City when he made the decision to remove the plaintiffs' flagpole from the Cemetery. The plaintiffs intended to use the flagpole for the purpose of flying the Confederate battle flag during the Confederate Memorial Day ceremony on April 26, 2000, and the removal of the flagpole the day before the ceremony prohibited them from doing so. Thus, the Mayor's decision to remove the flagpole on April 25, 2000, was certainly final, because the flagpole was in fact removed.[24] The plaintiffs were given no

---

**24.** Of course, the Mayor himself did not go to the Cemetery and remove the flagpole personally; the evidence reflects that he directed James Tavenner, Director of the City's Public Works Department, to remove the flagpole. (Burris Dep. at 38.) Furthermore, although it is undisputed that the flagpole was indeed removed, there is no evidence that Tavenner himself removed the flagpole, and it is entirely possible, perhaps probable, that Tavenner ordered subordinate employees of the Public Works Department to carry out the order. Under defendant's theory, if the Mayor was not acting as a policymaker for the City and was acting solely on his own behalf when he made the decision to remove the plaintiffs' flagpole, then plaintiffs should be pursuing individual claims against the Mayor, Tavenner, and all of the other employees who were involved in any way with the removal of the flagpole.

opportunity to appeal that decision before it was carried out; indeed, the plaintiffs were not even provided *notice* of the decision before it was carried out. The evidence reflects that the Mayor ordered the flagpole removed on April 24, 2000, and the following day it was removed.

Accordingly, the Court concludes that Mayor Burris was acting as the final decisionmaker on behalf of the City when he took these actions, and his actions are imputed to the City for the purposes of plaintiffs' Section 1983 claim.

### B. *Plaintiffs' Rights to Due Process of Law*

Plaintiffs contend that the City violated their due process rights under the Fifth and Fourteenth Amendments when it removed their flagpole and damaged it, thus depriving plaintiffs of their property, without sufficient notice and an opportunity to be heard before the City acted to destroy their flagpole, and without just compensation afterwards. Defendant argues that it provided the plaintiffs with sufficient notice and an opportunity to be heard before removing the flagpole from the cemetery, thus, it argues, the plaintiffs' due process rights were not violated.

■■■ As noted above, the Fifth Amendment protects citizens against government decisions which deprive them of their property or the full use of their property without just compensation. U.S. CONST., AMEND. V; *see Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 (11th Cir. 1989). The Takings Clause of the Fifth Amendment applies whenever government action renders property worthless, or de-

nies the owner of "all economically beneficial or productive use" of the property. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014–16, 112 S.Ct. 2886, 120 L.Ed.2d 798, (1992).

In addition, the Due Process Clause prohibits the government from depriving citizens of life, liberty or property without due process of law. U.S. CONST., AMEND. XIV; *see Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). The law is well-established that a fundamental tenet of due process is a fair and impartial tribunal. *Id.* As the Supreme Court said:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.... The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law.... At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," ... by ensuring no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

*Id.* at 242, 100 S.Ct. 1610 (citations omitted).

Plaintiffs argue that their rights under both the Fifth Amendment's Takings Clause and the Fourteenth Amendment's Due Process Clause were violated when the defendant removed their flagpole with-

Instead, plaintiffs have chosen to pursue their claim directly against the City, and are not pursuing separate claims against all the individual City employees who may have been involved with the physical removal of their flagpole, even though such employees arguably interfered with plaintiffs' constitutional rights when they did so. Under these circumstances, when all of the actions were taken under a direct command from the Mayor, such a command had the force of a City policy with respect to the plaintiffs' flagpole, and the entire course of conduct is attributable to the City itself under Section 1983.

out sufficient notice to them, and when defendant failed to provide just compensation for the taking of the flagpole. Defendant argues that plaintiffs were given two opportunities to be heard before their flagpole was ordered removed from the Cemetery: first, they were given notice of the special City Council meeting set for April 18, 2000, but chose not to attend; second, they were given an opportunity to be heard when they were brought before Magistrate Judge Mark Gaffney of the Stone Mountain Municipal Court for a hearing held on June 26, 2000.

The Court agrees with plaintiffs that the hearing before Magistrate Judge Gaffney was not adequate due process, because that hearing occurred after their flagpole had already been destroyed by the City. The plaintiffs had already been deprived of their property at that point. Moreover, the hearing before Magistrate Judge Gaffney involved the plaintiffs' citations for violating the Ordinance, and there is nothing in the record to indicate that the plaintiffs were afforded an opportunity at that hearing to pursue any remedy for the City's failure to compensate them for the taking of the flagpole.

The undisputed evidence reflects that the only "notice" the plaintiffs received of the special City Council meeting (that never actually occurred because of a lack of a quorum) was Mayor Burris's phone call to Hamby at approximately 11:00 p.m. the night before the "meeting," during which call Hamby explained to Burris that he was not the appropriate person to discuss the flagpole situation on behalf of the SCV. Furthermore, according to Hamby, he did follow up by calling City Hall the next day with the names and numbers of the appropriate persons to contact regarding the flagpole, but those persons were never contacted about appearing at any meeting. Defendant disputes that Hamby ever called City Hall with such information, but,

even so, it was the defendant's responsibility to notify the plaintiffs of the City's anticipated action, not the plaintiffs' responsibility to seek out the City.

Moreover, the undisputed evidence also reflects that plaintiffs' counsel sent the City Attorney a letter on April 20, 2000, requesting "courtesy notice of any action or hearing," yet the Mayor chose not to contact plaintiffs' counsel or anyone else with the SCV before ordering the removal of plaintiffs' flagpole on April 25, 2000. Under these circumstances, the Court concludes that even though plaintiffs were in violation of the ordinance when they erected a flagpole, defendants failed to afford the plaintiffs sufficient notice and an opportunity to be heard before removing and destroying their flagpole without a hearing. Although the undisputed facts reflect that the City failed to provide the plaintiffs with adequate notice before removing the flagpole, however, the record is not clear regarding what post-deprivation remedies were available to the plaintiffs.

With respect to their Due Process claim, plaintiffs have not articulated whether they are pursuing a "substantive due process" claim or a "procedural due process" claim. *See McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994). Given the rarity of a successful substantive challenge, the Court assumes the latter. Specifically, the "substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit' in the concept of ordered liberty.'" *Id.* at 1556 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). A right that is considered a fundamental right is protected against certain government actions, regardless of the fairness of the procedures used to carry out those actions. *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d

261 (1992)). Therefore, a substantive due process violation is complete when it occurs, and no amount of post-deprivation procedures can rectify the violation. *See, e.g., Rymer v. Douglas County,* 764 F.2d 796, 802 (11th Cir.1985) ("Substantive due process protects a general right of that individual to be free from the abuse of governmental power.").

■ A procedural due process violation, however, "is not complete 'unless and until the State fails to provide due process.' In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses ... does a constitutional violation actionable under section 1983 arise." *McKinney,* 20 F.3d at 1557 (quoting *Zinermon v. Burch,* 494 U.S. 113, 123, 110 S.Ct. 975, 108 L.Ed.2d 100, (1990)).

Accordingly, because the plaintiffs have not asserted a claim for the deprivation of a fundamental right, the plaintiffs have asserted a "procedural due process" claim which is protected only by the procedural portion of the Due Process Clause. As an alleged procedural due process violation, no constitutional violation takes place until the state refuses to provide a remedy. *See Zinermon,* 494 U.S. at 123, 110 S.Ct. 975. Thus, in order to establish their claim for a due process violation, the plaintiffs must show that they have exhausted whatever post-deprivation state remedies are available, if any such remedies exist.

■ Moreover, the Supreme Court has explained that the Takings Clause also does not require predeprivation notice:

> The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation. Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously

with, the taking; all that is required is that a " 'reasonable, certain and adequate provision for obtaining compensation' " exist at the time of the taking. If the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," then the property owner "has no claim against the Government" for a taking. Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194–195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (citations omitted). Thus, "because the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking, the State's action here is not 'complete' until the State fails to provide adequate compensation for the taking." *Id.*

Because the parties have not briefed this issue on what state remedies were available to the plaintiffs for obtaining compensation, and whether the plaintiffs availed themselves of those procedures, the Court **DENIES** defendant's Motion for Summary Judgment on this claim without prejudice to either party's filing a motion for summary judgment within sixty (60) days of this Order, solely on the plaintiffs' due process and takings claim.[25]

### *CONCLUSION*

For the foregoing reasons, defendant's Motion for Summary Judgment [44] is **GRANTED in part, and DENIED in part.** The defendant's Motion is **GRANTED** with respect to the plaintiffs' First

---

**25.** Alternatively, defendant could simply reimburse plaintiffs for the cost of the flagpole that it destroyed and for clean-up expenses, which would likely moot this claim.

Amendment claim, but **DENIED** as to the plaintiffs' claim that their due process rights were violated when the defendant destroyed their flagpole and failed to provide just compensation.

If either party chooses to file a motion for summary judgment solely with respect to the plaintiffs' due process and takings claim, it shall do so within **sixty (60) days**[26] of the entry of this Order. If defendant fails to file a motion for summary judgment, the Court will construe that failure as an admission of liability as to the due process claim, as it is defendant's burden to show the existence of post deprivation procedures sufficient to compensate plaintiffs for the property that defendant destroyed.

All claims against the individual defendants Burris, Heil, Mitchell, Smith, Peet, Nash, and Benton, in both their individual and official capacities, are **DISMISSED with prejudice.**

---

**26.** The Court is allowing an extended briefing period to first give the parties an opportunity to explore whether they can settle this claim, as further attorney's fees for each side would conceivably exceed the cost of the flagpole and of any measures to alleviate the damage caused by defendant.